**KAYSVILLE CITY, Plaintiff and Petitioner,**

**v.**

**Joseph MULCAHY, III, Defendant and Respondent.**

No. 960468–CA.

Court of Appeals of Utah.

July 10, 1997.

Heslop, telling him an "individual believed to be drunk" was leaving Olsen's address, "heading towards Davis High School in white Toyota."

Officer Heslop drove toward the location. As he neared the high school, he saw only one car moving on the road. When the car passed him, he could see it was a white car, as described in the dispatch. Before stopping the car, Officer Heslop observed no traffic violations or signs of driver intoxication. After stopping the car and contacting its driver, he smelled the odor of alcohol coming from the driver. The driver was identified as Joseph Mulcahy III. Following a field sobriety test, Mulcahy was arrested for driving under the influence. Shortly afterward, a breath test revealed he had a .15 blood alcohol level.

Mulcahy filed a motion requesting that the trial court suppress the evidence obtained as a result of the car stop. He argued Officer Heslop did not have reasonable suspicion to support the stop and investigative detention, thus violating Mulcahy's Fourth Amendment right to be free of unreasonable search and seizure. The trial court granted his motion, and Kaysville City appeals.

Steven C. Earl, Kaysville, for Plaintiff and Petitioner.

Sharon S. Sipes, Ogden, for Defendant and Respondent.

Before WILKINS, GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Kaysville City challenges the trial court's order granting Joseph Mulcahy III's motion to suppress evidence. We reverse.

## FACTS

At about 5:58 a.m. on Sunday, April 7, 1996, DeWayne Olsen called police dispatch and reported that a "drunk individual" had been at his front door and had driven away in a white car—a "Toyota Celica, maybe." Olsen told the dispatcher that the car was heading out of his subdivision, "going east, towards the mountains ... on the main road that goes in front of Davis High School." Olsen further told the dispatcher that he believed the driver's name was "Joe" and gave the dispatcher what he thought was Joe's phone number. The dispatcher in turn radioed Kaysville City Police Officer Darin J.

## ISSUE AND STANDARD OF REVIEW

The sole issue before us is whether, under the facts of this case, reasonable suspicion existed to support the police in stopping and detaining Mulcahy. In *State v. Pena*, 869 P.2d 932 (Utah 1994), the Utah Supreme Court announced that "whether a specific set of facts gives rise to reasonable suspicion is a determination of law and is reviewable non-deferentially for correctness." *Id.* at 939. The court did, however, allow "a measure of discretion to the trial judge when applying th[e reasonable suspicion] standard to a given set of facts." *Id.* Noting that fact situations in this arena are "quite variable," the court stated that "[i]t would be impractical for an appellate court to review every reasonable-suspicion determination de novo and then pronounce whether each unique factual setting rises to the level of reasonable suspicion as a matter of law." *Id.* at 940.

Even so, although the court did not contemplate "a close, de novo review" in reasonable suspicion cases, it did caution that "a sufficiently careful review is necessary to assure that the purposes of the reasonable-suspicion requirement are served." *Id.* at 939. Further, the court did not preclude us from limiting the trial courts' discretion when "reviewing courts have enough experience with certain recurring fact patterns that the legal effect of those patterns can be settled with comfort." *Id.* at 940. This case presents such a fact pattern.

■ Reviewing courts across the country have repeatedly held under similar facts in reasonable suspicion cases that (1) an informant who tips police that a drunk driver is on the road need not give details as to why he or she believes the driver is drunk, and (2) before stopping the suspect vehicle, the police officer need not have seen traffic violations or signs of drunk driving. *See infra* p. 235. Any discretion exercised by trial courts in comparable cases should only be within those parameters, as adopted by this opinion. *See State v. Smith*, 638 N.E.2d 1353, 1355 (Ind.Ct.App.1994) (holding "as a matter of law" that stop was supported by reasonable suspicion when informant reported drunk driver and officer observed no violations before stop).

### ANALYSIS

■ A car stop and investigatory detention by police of the car's occupants is a "seizure" under the Fourth and Fourteenth Amendments. *See State v. Case*, 884 P.2d 1274, 1276 (Utah.Ct.App.1994). To surmount the Fourth Amendment's proscription against unreasonable seizures, the stop and detention must satisfy a two-part test: "First, the officer's initial stop must be justified; second, subsequent actions must be within the scope of the circumstances justifying the stop." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). This case concerns only the first part of the test. We therefore must determine whether Officer Heslop was justified in stopping Mulcahy's car.

■ A stop is justified if a police officer has reasonable suspicion that a person is engaging in criminal behavior. *See id.* " '[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.' " *State v. Menke*, 787 P.2d 537, 541 (Utah.Ct. App.1990) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880). Although the necessary degree of suspicion is lower than that necessary for probable cause to arrest, "the same totality of facts and circumstances approach is used to determine if there are sufficient 'specific and articulable facts' to support reasonable suspicion." *Case*, 884 P.2d at 1276 (citation omitted). Also, the State bears the burden of establishing those sufficient articulable facts. *See id.*

■ The articulable facts supporting reasonable suspicion are usually grounded in an officer's personal perceptions and inferences, but in some cases the officer may rely upon external information—e.g., an informant's tip via police dispatch. *See id.* at 1276–77; *see also State v. Pena*, 869 P.2d 932, 940 (Utah 1994) ("Under certain circumstances, police officers can rely on a dispatched report in making an investigatory stop."). An officer receiving a dispatched message "may take it at face value and act on it forthwith." *Case*, 884 P.2d at 1277–78 n. 5. Nonetheless, should the investigation end in arrest and the stop's legality be attacked, the State must—"albeit after the fact"—establish that adequate articulable suspicion initially spurred the dispatch. *Id.* Thus, our core inquiry is whether the State presented sufficient evidence in this case to show that the dispatch relaying the informant's tip was based on reasonable suspicion.

■ To decide this, we must probe the reliability of the informant's tip. *See State v. Grovier*, 808 P.2d 133, 135 (Utah.Ct.App. 1991) ("A reasonable suspicion may be based upon an informant's tip so long as it is sufficiently reliable."). Although Utah courts have not addressed whether reasonable suspicion may be based on an informant's report of a drunk driver, absent corroboration by a police officer of traffic violations or intoxi-

cation,[1] we have gleaned from Utah cases three factors to consider in determining the reliability and sufficiency of the informant's report in this case. However, we supplement and clarify our analysis with pertinent principles from the numerous other states addressing facts more on point with those of this case—the overwhelming majority of which have upheld the stops involved in those cases as supported by reasonable suspicion. *See, e.g., Goodlataw v. State,* 847 P.2d 589, 590–91 (Alaska.Ct.App.1993); *State v. Robles,* 171 Ariz. 441, 831 P.2d 440, 441–43 (Ct.App. 1992); *People v. Willard,* 183 Cal.App.3d Supp. 5, 228 Cal.Rptr. 895, 896–97 (Super.Ct.1986); *Peterson v. Tipton,* 833 P.2d 830, 831–32 (Colo.Ct.App.1992); *State v. Evans,* 692 So.2d 216, 218–19 (Fla.Dist.Ct.App. 1997); *State v. Butler,* 224 Ga.App. 397, 480 S.E.2d 387, 388–89 (1997); *State v. Smith,* 638 N.E.2d 1353, 1355–56 (Ind.Ct.App.1994); *State v. Markus,* 478 N.W.2d 405, 408–09 (Iowa.Ct.App.1991); *State v. Tucker,* 19 Kan. App.2d 920, 878 P.2d 855, 862–64 (1994); *State v. Sampson,* 669 A.2d 1326, 1328 (Me. 1996); *Playle v. Commissioner of Pub. Safety,* 439 N.W.2d 747, 748–49 (Minn.Ct.App. 1989); *State v. Melanson,* 140 N.H. 199, 665 A.2d 338, 340–41 (1995); State ex rel. *Taxation & Revenue Dep't v. Van Ruiten,* 107 N.M. 536, 760 P.2d 1302, 1304–05 (Ct.App. 1988); *People v. Rance,* 227 A.D.2d 936, 644 N.Y.S.2d 447, 447 (1996); *State v. Bryl,* 477 N.W.2d 814, 817 (N.D.1991); *Rittman v. State,* 875 P.2d 439, 441 (Okla.Ct.App.1994); *State v. Perrin,* 143 Or.App. 123, 923 P.2d 1249, 1251 (1996); *State v. Lownes,* 499 N.W.2d 896, 900 (S.D.1993); *State v. Sailo,* 910 S.W.2d 184, 188–89 (Tex.App.1995). *But see Campbell v. State,* 31 Wash.App. 833, 644 P.2d 1219, 1220–21 (1982).

 As our first factor, we focus on the type of tip or informant involved. *See State v. Roth,* 827 P.2d 255, 257 (Utah.Ct.App. 1992). After all, "[n]ot all tips are of equal value in establishing reasonable suspicion."

*Evans,* 692 So.2d at 218. For instance, "[b]ecause an anonymous caller's basis of knowledge and veracity are typically unknown," anonymous tips are toward "the low-end of the reliability scale." *Id.*

 In contrast, an identified "citizen-informant" is high on the reliability scale. *See id.* at 219; *accord Dionne v. State,* 766 P.2d 1181, 1183 (Alaska.Ct.App.1989); *Van Ruiten,* 760 P.2d at 1305. The ordinary citizen-informant needs no "independent proof of reliability or veracity." *State v. Brown,* 798 P.2d 284, 286 (Utah.Ct.App.1990) (sufficiency-of-affidavit-for-probable-cause context); *see also Willard,* 228 Cal.Rptr. at 897–98 (holding reasonable suspicion supported car stop based on citizen-informant tip regarding drunk driver); *Evans,* 692 So.2d at 219 (same). We simply assume veracity when a citizen-informant provides information as a victim or witness of crime. *See State v. Miller,* 740 P.2d 1363, 1366 (Utah.Ct. App.1987) (sufficiency-of-affidavit-for-probable-cause context); *accord Evans,* 692 So.2d at 218–19. "This is because citizen informers, unlike police informers,[2] volunteer information out of concern for the community and not for personal benefit." *Brown,* 798 P.2d at 286; *accord Dionne,* 766 P.2d at 1183.

Further weighing in favor of the reliability and veracity of a named citizen-informant is that "the informant is exposed to possible criminal and civil prosecution if the report is false." *State v. Bybee,* 131 Or.App. 492, 884 P.2d 906, 908 (1994); *cf. Sailo,* 910 S.W.2d at 188 (noting increased reliability of information when informant "present[s] himself to the officer ... while driving a car from which his identity might easily be traced, put[ting] himself in a position to be held accountable for his intervention"). And, by providing his or her name, a citizen-informant "ma[kes] it possible for the police to verify the facts

---

1. *State v. Roth,* 827 P.2d 255 (Utah.Ct.App.1992), has some factual similarity to this case. However, the police officer in that case corroborated signs of drunk driving before making the car stop, and the court relied on that to some extent in determining reasonable suspicion existed. *See id.* at 258.

2. A police informant is one who gains information through involvement in criminal activity or who is "'motivated ... by pecuniary gain.'" *State v. Evans,* 692 So.2d 216, 219 (Fla.Dist.Ct. App.1997) (citation omitted). Such an informant would obviously be lower on the reliability scale than a citizen-informant. *See id.*

underlying the report." *Roth,* 827 P.2d at 258.

The second factor we explore is whether the informant gave enough detail about the observed criminal activity to support a stop. *See Roth,* 827 P.2d at 258 (concluding "sufficient factual foundation" supported dispatch resulting in stop). For instance, the informant in *Roth* gave enough detail in reporting "the existence of a drunk driver along with a description of the driver's vehicle, license number, and location." *Id.* A tip is more reliable if it is apparent that the informant observed the details personally, instead of simply relaying information from a third party. *See Bybee,* 884 P.2d at 908; *accord Tucker,* 878 P.2d at 862; *Melanson,* 665 A.2d at 339–40. Moreover, there must be no hint of fabrication. *See Bybee,* 884 P.2d at 908.

The final factor is whether the police officer's personal observations confirm the dispatcher's report of the informant's tip. *See Roth,* 827 P.2d at 258. "The officer may corroborate the tip either by observing the illegal activity or by finding the person, the vehicle and the location substantially as described by the informant." *Bybee,* 884 P.2d at 908; *see also Markus,* 478 N.W.2d at 408 ("[F]acts were corroborated when the officers found the described vehicle going in the direction and on the highway reported by the caller.... Independent corroboration of the *inculpatory* details of an informant's tip is not mandatory."); *Sampson,* 669 A.2d at 1328 (concluding corroboration sufficient when car description and location—but not intoxication—confirmed); *Melanson,* 665 A.2d at 340 (stating corroboration of " 'innocent' details" given by informant shows reliability); *Sailo,* 910 S.W.2d at 189 ("Appellee argues in his brief that it is the *conduct* indicating criminal activity related by the informant that must be corroborated in order for reasonable suspicion to exist. Such is clearly not the law. Corroboration by the police officer means, in light of the circumstances, he confirms enough facts so that he may reasonably conclude that the information provided is reliable and a detention is justified."). Certainly, "officers are encouraged to investigate the suspect immediately,

rather than to allow the suspect to drive so that the officer may observe the driving. Otherwise, the risk that the suspect will be involved in an accident increases, which is not in the public's interest." *Playle,* 439 N.W.2d at 749; *see also Rittman,* 875 P.2d at 441 ("We specifically hold ... that the officer was not required to wait until [the defendant] put himself and the general public in danger by driving his truck on the public streets and highways before making an investigation."). Lastly, regarding this factor, "[w]here the reliability of the information is increased, less corroboration is necessary." *Sailo,* 910 S.W.2d at 188.

Before proceeding further, we think it vital to emphasize that the tip in this case reported a drunk driver who was at that time on the road. We therefore must consider

> the ever-changing equation used to balance the rights of an individual to be free from unwarranted intrusions of his or her freedom of movement and right to privacy with the right of the public to be protected from unreasonable danger. This equation and the balance change with the facts presented.

*Tucker,* 878 P.2d at 858. As the Kansas Court of Appeals noted in *State v. Tucker,* "A motor vehicle in the hands of a drunken driver is an instrument of death. It is deadly, it threatens the safety of the public, and that threat must be eliminated as quickly as possible." *Id.* at 861. Under those circumstances, "[a]n investigatory ... stop of a suspected drunken driver is a [comparatively] minimal intrusion upon that driver's freedom of movement and privacy." *Id.* We agree with the *Tucker* court "that the greater and more immediate the risk to the public revealed by the tip, the less importance we will accord to the process of corroboration or verification of the tip." *Id.* at 862. Thus, the following application of the law to the facts of this case is colored by our belief that "[t]he 'totality' of circumstances tips the balance in favor of public safety and lessens the ... requirements of reliability and corroboration." *Id.* at 864.

■ Considering the first factor, we note that Olsen was an identified citizen-informer, providing information as a witness of a crime about a drunk driver. Moreover, by giving his name and address, Olsen exposed himself to prosecution if his report was false and made himself available to verify the report's details. *See supra* p. 235. He was therefore high on the reliability scale, and we simply presume his report to the dispatcher was reliable and truthful. *See id.*

Under the second factor, we examine whether the amount of detail Olsen gave the dispatcher/officer was sufficient to support a stop of Mulcahy. Olsen reported a "drunk individual" had been at his front door and had driven away in a white car—possibly a Toyota—heading out of his subdivision toward the main road in front of Davis High School.

■ That Olsen reported a "drunk individual" without explaining why he thought the person was drunk does not by itself nullify reasonable suspicion. *See Perrin*, 923 P.2d at 1251. After all, "although conclusory, the informant's statement that the driver was intoxicated was 'the kind of shorthand statement of fact that lay witnesses have always been permitted to testify to in court.'" *Dionne*, 766 P.2d at 1184 (citation omitted); *see, e.g., Playle*, 439 N.W.2d at 749 ("A layperson is qualified to give an opinion as to whether a person is under the influence, based upon observations of that person."). Regarding this particular detail provided by Olsen—that the driver was "drunk"—we conclude that

> because members of the general public have a common knowledge about whether a person is under the influence of alcohol, a statement from a named informant, based on his own personal observations, that a person is a "drunken driver" conveys sufficient information to allow a reviewing judge to determine that the facts created reasonable suspicion.

*Bybee*, 884 P.2d at 909; *see also Willard*, 228 Cal.Rptr. at 897 ("The objective signs of intoxication are matters of common knowledge and experience. Implicit in the motorist's statement is that he had observed defendant and believed him to be drunk.").

Other details given by Olsen were the color, location, and possible make of the suspect's car. While Olsen gave neither a license number nor a driver description, the car description itself was adequate because, "coupled with the time of day and the [complete] absence of ... traffic," it gave the officer "an objective basis" to conclude Mulcahy's car was that described by the dispatcher. *Robles*, 831 P.2d at 442; *see also Bryl*, 477 N.W.2d at 817 ("Considering ... the late hour, it was reasonable to determine that the pickup leaving the lot was the pickup in question."). "The brevity and lack of detail of the description are explainable by [Olsen's] need to act quickly to get the message to the police so that they could intercept [Mulcahy] before he injured someone." *Effenbeck v. State*, 700 P.2d 811, 815 (Alaska.Ct.App.1985).

■ Further, the details given by Olsen have a heightened air of reliability because Olsen personally observed those details and there was no hint of fabrication. "'An informant who has personally observed incriminating behavior has a stronger basis of knowledge than does an informant who relates not what he knows personally, but what he has heard others say.'" *Melanson*, 665 A.2d at 340 (citation omitted). The events prompting Olsen's call unfolded as he spoke on the phone with the dispatcher. He reported Mulcahy's activities as he was seeing them. At the beginning of the phone call, Mulcahy was on Olsen's doorstep, then as the phone call continued, Olsen reported seeing Mulcahy enter the car and drive away in a certain direction. Based on the transcript of the phone call, there is no question Olsen personally observed the details he reported and was not concocting them. Moreover, Olsen's "statement was ... anchored in time and place negating any risk that the information furnished was stale and that the suspect was no longer dangerous." *Effenbeck*, 700 P.2d at 813.

Finally, we turn to the third factor: whether the police officer's own observations confirmed the dispatcher's transmittal of the informant's tip. *See Roth*, 827 P.2d at 258. Before Officer Heslop stopped Mulcahy, he

observed no traffic violations or signs that Mulcahy was drunk. However, he did corroborate Olsen's report by finding "the described vehicle going in the direction and on the highway reported by the caller." *Markus,* 478 N.W.2d at 408; *accord Lownes,* 499 N.W.2d at 900. Officer Heslop was able to verify that Olsen had accurately described the car's color and location and had identified a similar make of car (what Olsen thought might be a Toyota was instead a Mazda). Also, "that the report and the verification occurred within a few minutes supports the [informant's] credibility." *Melanson,* 665 A.2d at 340; *Bryl,* 477 N.W.2d at 817 (noting officer's "quick reaction time" strengthened verification of report).

## CONCLUSION

Having considered the three factors, together with the grave public danger threatened and inflicted by drunk drivers, we conclude that (1) as a citizen-informant, Olsen was high on the reliability scale, (2) Olsen supplied sufficient detail to support a stop and detention, and (3) Officer Heslop satisfactorily corroborated Olsen's report. Thus, we hold under the totality of the circumstances that the State carried its burden of showing that Officer Heslop's stop and investigatory detention of Mulcahy were supported by reasonable suspicion based on the specific, articulable facts from Olsen's report. The trial court therefore incorrectly applied reasonable suspicion law to the facts of this case. Accordingly, we reverse.

WILKINS, Associate P.J., and GREENWOOD, J., concur.