2001 UT App 332

**STATE of Utah, Plaintiff and Appellee,**

v.

**Gabriel Alipi VALENZUELA, Defendant and Appellant.**

No. 20000684–CA.

Court of Appeals of Utah.

Nov. 8, 2001.

Linda M. Jones and Otis Sterling III, Salt Lake Legal Defender Association, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General and Marian Decker, Assistant Attorney General, Salt Lake City, for Appellee.

Before GREENWOOD, P.J., and DAVIS, and THORNE, JJ.

## OPINION

THORNE, Judge:

¶ 1 Defendant Gabriel Valenzuela appeals the denial of his motion to suppress and his subsequent conviction for Possession of a Controlled Substance, a third degree felony, in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (Supp.1998). We reverse.

## BACKGROUND

¶ 2 On the morning of March 10, 1999, the Salt Lake County Sheriff's Office dispatch received a report from an unidentified informant of a forgery in progress at the Taylorsville branch of the First Security Bank. In addition to the reported forgery, the informant identified the suspect as an Hispanic male. The informant also described the suspect's clothing. Dispatch communicated this information to Deputy Jose Flores, who then drove to the bank to investigate. Upon entering the bank, Deputy Flores immediately noticed Valenzuela, an Hispanic male wearing clothing similar to the clothing described in the report. Flores also saw a bank teller point towards Valenzuela.

¶ 3 Believing Valenzuela to be the suspect mentioned in the report, Flores approached Valenzuela, informed him that he was being placed in custody for safety reasons, and placed him in handcuffs. Flores then told Valenzuela that he was suspected of "passing out a bad check," and asked for and received Valenzuela's name. He then "removed [Valenzuela] out of the public's eye," and proceeded to search him, ostensibly looking for identification. While searching Valenzuela's pants, Flores discovered "a miniature plastic bag which contained white particles of crystal like substance," which was later determined to be methamphetamine.

¶ 4 Based on this discovery, Flores formally only arrested Valenzuela for possession of a controlled substance and then proceeded to investigate the forgery report. The investigation, however, yielded insufficient information to charge Valenzuela with either forgery or attempted forgery.

¶ 5 In the district court, Valenzuela moved to suppress the methamphetamine Flores had discovered during the search arguing that the search violated the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968) ("The scope of the search must be 'strictly tied to and justified by' the circumstances which

rendered its initiation permissible." (Citation omitted)). The State, in turn, argued that the search was valid incident to arrest; therefore, *Terry* was inapplicable.

¶ 6 Following oral argument, the trial court denied Valenzuela's motion. Ruling from the bench, the trial court concluded that "based on the facts of the call to the sheriff's office and the dispatch given to the officer, the officer had probable cause to go into that bank and to believe that a forgery had been or was in the process of being committed and to arrest [Valenzuela]." The court further concluded that Flores had placed Valenzuela under arrest prior to the search, and therefore the search was valid incident to the arrest. Following the ruling, Valenzuela entered a conditional guilty plea to possession of a controlled substance and was sentenced to an indeterminate term of zero to five years in prison. The court, however, suspended the jail time and placed Valenzuela on probation for thirty-six months.

¶ 7 Valenzuela appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 8 Valenzuela argues the trial court erred in denying his motion to suppress. " 'In reviewing a trial court's ruling on a motion to suppress evidence, we will not overturn [its] factual findings absent clear error.' The trial court's legal conclusions, however, we review for correctness." *State v. Navanick*, 1999 UT App 265, ¶ 7, 987 P.2d 1276 (internal citations omitted); *see also State v. Anderson*, 910 P.2d 1229, 1232 (Utah 1996).

## ANALYSIS

¶ 9 Valenzuela argues that Flores lacked sufficient probable cause to justify his arrest, and therefore, the search cannot be

valid incident to arrest.[1] "The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' " *Terry*, 392 U.S. at 8, 88 S.Ct. at 1873. As a result, we generally consider searches conducted without the benefit of a properly issued warrant to be unreasonable. *See State v. James*, 2000 UT 80, ¶ 9, 13 P.3d 576. However, this basic tenant of Fourth Amendment jurisprudence is not without exception. Further, it is well-settled that warrantless searches conducted by police officers incident to a valid arrest invoke such an exception. *See State v. Gallegos*, 967 P.2d 973, 978–79 (Utah Ct.App.1998). Therefore, in the present circumstance, our inquiry must focus on whether Flores lawfully arrested Valenzuela.

¶ 10 When an officer effects an arrest for an alleged offense committed outside of his or her presence, we evaluate the legality of the arrest objectively. *See State v. Ayala*, 762 P.2d 1107, 1111 (Utah Ct.App. 1988). To properly make this evaluation, in general, we must determine " ' "whether from the facts known to the officer, and the inferences which fairly might be drawn therefrom, a reasonable and prudent person in his position would be justified in believing that the suspect had committed the offense." ' " *Anderson*, 910 P.2d at 1233 (quoting *State v. Cole*, 674 P.2d 119, 125 (Utah 1983) (citation omitted)); *see also State v. Clark*, 2001 UT 9, ¶ 11 & n. 1, 20 P.3d 300 (explaining that probable cause exists when a person of reasonable intelligence believes there is a fair probability *a crime has been committed* and *a specific individual committed the crime* ).[2]

¶ 11 Here, because the State predicates its probable cause argument upon in-

---

1. Valenzuela also argues that the search violated the tenets articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, because the State does not dispute that the search exceeded the scope of a traditional *Terry* search, we examine only whether Flores had probable cause to arrest Valenzuela prior to the search.

2. We note that the standards applied to the review of a warrantless arrest "are at least as

stringent as the standards" applied to a magistrate's assessment of the facts when issuing a warrant. *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 566, 91 S.Ct. 1031, 1036, 28 L.Ed.2d 306 (1971). Effectively, our examination hinges on the factual basis of the arrest looking to determine whether the officer had sufficient information to support an *independent judgment* of probable cause. *See id.*, 401 U.S. at 564, 91 S.Ct. at 1035.

formation received from an informant, "[w]e must examine the 'totality of the circumstances' to determine whether the informant's tip, together with police observations, provided probable cause to arrest" *Valenzuela.* *Anderson,* 910 P.2d at 1233 (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). "This inquiry involves 'a practical, common-sense decision whether, given all the circumstances ..., including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that ... evidence of a crime will be found.'" *Id.* (quoting *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332).

¶ 12 Valenzuela argues that the appropriate analytical structure to assess the totality of the circumstances in this case is set forth in *Kaysville City v. Mulcahy,* 943 P.2d 231 (Utah Ct.App.1997). We agree.

¶ 13 In *Mulcahy,* an informant called police dispatch to report a suspected drunk driver. *See id.* at 233. The report included the informant's name and address, a description of the car involved, the direction of the suspect's travel, the street name where the suspect was last seen as well as the suspect's name and phone number. *See id.* This information was communicated by dispatch to a Kaysville City Police officer, who then drove to the area. *See id.* The officer soon spotted the car described by the informant. *See id.* Without waiting to personally witness signs of intoxication, or any other traffic violation, the officer stopped the suspect. *See id.* Eventually, the officer arrested the driver for DUI. *See id.* After charges were formally filed, the driver moved to suppress the evidence resulting from the traffic stop, arguing that the officer had no reasonable articulable suspicion to justify the stop. *See id.* The trial court agreed and granted the motion. *See id.* Kaysville City appealed.

¶ 14 On appeal, we reversed the trial court's decision, concluding that the informant's tip was sufficiently reliable to support a reasonable articulable suspicion that Mulcahy was driving under the influence of alcohol. *See id.* at 238. In arriving at this conclusion, we first determined that "[t]he articulable facts supporting reasonable suspi-

cion are usually grounded in an officer's personal perceptions and inferences, but in some cases the officer may rely upon external information—e.g., an informant's tip via police dispatch." *Id.* at 234. We further stated that "[a]n officer receiving a dispatched message 'may take it at face value and act on it forthwith.'" *Id.* (quoting *State v. Case,* 884 P.2d 1274, 1277 n. 5 (Utah Ct.App.1994)). But, we cautioned, if the investigation results in an arrest and the defendant objects to the legality of the initial investigatory detention, the State is required to "establish that adequate articulable suspicion initially spurred the dispatch." *Id.* To do so, the State must "show that the dispatch relaying the informant's tip was based on reasonable suspicion," *id.,* which requires the reviewing court to "probe the reliability [and sufficiency] of the informant's tip." *Id.*

¶ 15 Thus, we articulated "three factors [a court must] consider in determining the reliability and sufficiency of the informant's report." *Id.* at 235. Our first focus is upon "the type of tip or informant involved," *id.,* granting identified informants substantially more credibility than anonymous informants. *See id.* Next, we examine "whether the informant gave enough detail about the observed criminal activity to support a [seizure]," and concluded that "[a] tip is more reliable if it is apparent that the informant observed the details personally, instead of relaying information from a third party." *Id.* at 236. Finally, we examine "whether the police officer's personal observations confirm the dispatcher's report of the informant's tip," noting that an officer can corroborate the information "'either by observing the illegal activity[,] or by finding the person, [and the other material facts] substantially as described by the informant.'" *Id.* (citation omitted). Moreover, while we stated that "'[w]here the reliability of the information is increased, less corroboration is necessary,'" *id.* (alteration in original) (citation omitted), we also established that absent a risk to public safety we expect police officers to make significant independent corroborative efforts to confirm the information. *See id.*

¶ 16 For clarity, we note that while the *Mulcahy* factors were formulated to as-

sist in determining whether an officer had the necessary reasonable articulable suspicion to justify a traffic stop, we see nothing to prohibit extending the use of these factors to determinations of probable cause in the context of information supplied by an informant. *See Mulcahy*, 943 P.2d at 234 (Stating that "[a]lthough the necessary degree of suspicion [to establish reasonable articulable suspicion] is lower than that necessary for probable cause to arrest, 'the same totality of facts and circumstances approach is used to determine if there are sufficient "specific and articulable facts" to support reasonable suspicion.'" (quoting *Case*, 884 P.2d at 1276 (citation omitted))); *see also Gates*, 462 U.S. at 241–46, 103 S.Ct. at 2334–36 (finding probable cause existed to arrest the defendant after examining the reliability of the informant, the content of the tip, and the corroborative efforts of the agent); *Draper v. United States*, 358 U.S. 307, 313–14, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (same); *accord, United States v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) ("'[I]n making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' That principle applies equally well to the reasonable suspicion inquiry." (Citation omitted.)).

¶ 17 Moreover, we find this approach to be consistent with the recent Utah Supreme Court decision embracing the "totality of the circumstances" analysis articulated in *Gates. See Anderson,* 910 P.2d at 1232–33 (citing *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332). The *Mulcahy* factors clearly focus on examining the totality of the circumstances in these situations and will provide trial courts and trial counsel assistance when faced with similar probable cause determinations in the future. *See Mulcahy* 943 P.2d at 234.

■ ¶ 18 Here, after examining the record, we conclude Deputy Flores did not have probable cause to arrest Valenzuela before he conducted the search. Further, we are convinced that the present case presents a substantially different picture than *Gates, Draper,* or *State v. Webb,* 149 Ariz. 158, 717 P.2d 462 (Ct.App.1985) (cited for the first time in oral argument), and that the State's assertion to the contrary is misplaced.

¶ 19 In *Gates,* the United States Supreme Court was faced with the following question: Is information supplied by an unidentified informant sufficient on its own to provide a basis "for a magistrate's determination that there was probable cause to believe contraband would be found in the Gateses' car and home"? *Gates,* 462 U.S. at 227, 103 S.Ct. at 2336. In answer, the Court determined that information supplied by an unidentified informant could not alone create probable cause to support the issuance of a search warrant. *See id.* However, after examining the totality of the circumstances, the Court further determined that the informant had provided "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, *but to future actions of third parties not easily predicted." Id.* at 245, 103 S.Ct. at 2335–36 (emphasis added). In addition, "the facts obtained through the [officer's] independent investigation ... at least suggested that the Gateses were involved in drug trafficking." *Id.* at 243, 103 S.Ct. at 2335. Accordingly, based upon the quality and quantity of detail the informant provided, which the police independently corroborated, the court determined that the magistrate had "'a substantial basis for ... [concluding]' that probable cause to search the Gateses' home and car existed." *Id.* at 246, 103 S.Ct. at 2336 (alteration in original) (citation omitted).

¶ 20 In *Draper,* a reliable confidential informant, who had been working for the DEA for at least the previous six months, informed a federal narcotics agent that the defendant, a suspected drug dealer, would be arriving by rail in Denver, Colorado, carrying heroin. *See Draper v. United States,* 358 U.S. 307, 309, 79 S.Ct. 329, 331, 3 L.Ed.2d 327 (1959). The informant's report contained the defendant's name, a detailed description of the defendant, a description of the clothes the defendant would be wearing on the date of his arrival, and the defendant's travel plans, including the date and time of the defendant's arrival. *See id.*

¶ 21 In response, the agent went to the railroad station on the appointed morning

and waited. *See id.*[3] There, the agent saw the defendant who matched the "exact physical attributes" and was "wearing the precise clothing" described by the informant. *Id.* Therefore, the agent arrested the defendant and searched him incident to the arrest, discovering a small amount of heroin. *See id.* at 310, 79 S.Ct. at 331. Subsequently, the defendant was charged and convicted with concealing and transporting narcotic drugs. *See id.* at 308, 79 S.Ct. at 329.

¶ 22 On appeal, the United States Supreme Court concluded that the informant's report provided the federal agent with sufficient information to justify further investigation. *See id.* at 313, 79 S.Ct. at 333. The court also determined that the agent

> had personally verified every facet of the information given him by [the informant] except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of [the informant's] information being thus personally verified, [the agent] had "reasonable grounds" to believe that the remaining unverified bit of [the informant's] information—that [the defendant] would have the heroin with him—was likewise true.

*Id.* Accordingly, the Court concluded, based on the informant's report and the agent's successful efforts to verify the details of the report, that the agent had probable cause to believe that the defendant "was committing a violation of the laws of the United States ... at the time he arrested him." *Id.*

¶ 23 Finally, the Arizona Court of Appeals in *Webb* was faced with a situation not dissimilar to the instant case. *See State v. Webb,* 149 Ariz. 158, 717 P.2d 462, 465–66 (Ct.App.1985). In *Webb,* an officer received a radio dispatch directing him to investigate a report of a forgery in progress at a local bank. *See id.* at 465. The report included a description of the suspect, "blonde male approximately 25 years old," and informed the officer that he "would be met at the bank entrance by [a bank] employee." *Id.* Upon arrival, the officer was met by an employee who then pointed out the defendant as the suspected forger. *See id.* The employee also told the officer that the defendant was the person "passing bad checks." *Id.* On appeal, the Arizona court concluded that "the officer had sufficient probable cause to arrest the appellant and to search him incident to that arrest when he first arrived at the bank in response to the radio dispatch and the bank employee pointed to the appellant as the person passing the bad checks." *Id.*

¶ 24 We find these cases distinguishable from our case today.

¶ 25 First, the identity of the informant in today's case is unknown. And, while the State argues on appeal that "the only reasonable and fair inference from the record is that the informant was the bank teller," the record below contains no evidence concerning either the informant's identity,[4] or the informant's basis of knowledge supporting the assertion that a forgery was in progress.[5] This situation is strikingly differ-

---

**3.** The informant actually mentioned two consecutive days. *See Draper,* 358 U.S. at 309, 79 S.Ct. at 331. The observations referred to herein occurred on the second day. *See id.*

**4.** The State also asserts that Valenzuela failed to preserve this issue for appeal. *See State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346 ("As a general rule, claims not raised before the trial court may not be raised on appeal."). We disagree. First, Valenzuela contested the State's claim that Flores had probable cause to make an arrest prior to the discovery of the methamphetamine. Our case law is clear, under these circumstances, the State bears the burden of proving that the dispatch was initially spurred by at least articulable suspicion. *See Mulcahy,* 943 P.2d at 234. Next, following the trial court's denial of the motion, Valenzuela's trial counsel requested that

the trial court articulate specific factual findings, and then, following the court's refusal, requested permission to "rephrase what the court said." The court again refused counsel's request. We conclude that by requesting the trial court articulate specific findings, presumptively to object to those specific findings, Valenzuela's trial counsel sufficiently preserved this issue.

**5.** For instance, we do not know whether the informant actually talked to Valenzuela, received a second hand report, or merely overheard part of a conversation. Nor do we know if someone within the bank recognized Valenzuela as the source of prior problems within the bank, or if Valenzuela was merely a customer who may or may not have had problems communicating his business needs to a teller.

ent from both *Draper* and *Webb.* In *Draper,* the informant was a paid confidential informant who had previously provided "accurate and reliable" information to the DEA agent involved. *Draper,* 358 U.S. at 309, 79 S.Ct. at 331. In *Webb,* the dispatch information obviously originated from a bank employee, *see Webb,* 717 P.2d at 465 (stating that the informant had arranged for the officer to meet a bank employee upon his arrival), and the police officer specifically confirmed the report with a bank employee upon his arrival at the bank. *See id.*

¶ 26 Here, Deputy Flores seems to have been operating under the assumption that the report had issued from the bank. Upon his arrival, Flores also seems to have assumed that the bank teller had specific knowledge of the alleged crime, as well as assuming that the teller was specifically pointing out Valenzuela. However, there is *nothing* in the record to support any of these assumptions. Because we find no evidence to identify the informant, we presume that the informant's identity is unknown. Absent such information, we are left to concentrate our analysis on the remaining *Mulcahy* factors.[6]

¶ 27 Next, even accepting Flores's testimony concerning the content of the informant's tip, we conclude that, by itself, the tip contained insufficient detail to support a reasonable belief that Valenzuela was attempting to commit a forgery. According to Flores's testimony, dispatch directed him to *investigate* a report of a forgery in progress. The report identified the suspect as an Hispanic male and included only a description of the suspect's clothing.[7]

■ ¶ 28 First, "[m]erely providing descriptive information to an officer about *whom* to stop, by itself, is not enough to justify the stop if there are no articulable facts pointed to which establish *why* a stop

was to be made." *Case,* 884 P.2d at 1278 (footnote omitted). Next, nothing in the anonymous report indicated whether the informant had personally observed the details of the purported criminal activity. *See Mulcahy,* 943 P.2d at 236. Finally, unlike the reports in *Gates* and *Draper,* the report in the present case did not contain a rich amount of detailed information that Flores could have easily verified to establish the reliability of the information. *See Gates,* 462 U.S. at 245, 103 S.Ct. at 2335–36; *Draper,* 358 U.S. at 309–10, 79 S.Ct. at 331. Therefore, relying on the tip alone, " ' "a reasonable and prudent person . . . would [not] be justified in believing that the suspect had committed the offense." ' " *Anderson,* 910 P.2d at 1232–33 (citations omitted).

¶ 29 Accordingly, any finding of probable cause must rest solely on whether Flores's "personal observations confirm[ed] the dispatcher's report of the informant's tip, . . . 'either by observing the illegal activity[,] or by finding the person [and the other material facts] substantially as described by the informant.' " *Mulcahy,* 943 P.2d at 236 (citation omitted).

■ ¶ 30 After examining the record, we are not convinced that Flores personally confirmed any material element of the information contained in the report that would corroborate the informant's tip. The record does demonstrate, however, that upon entering the bank, Flores observed a Hispanic male wearing clothing that matched the description provided by dispatch. Moreover, Flores's sole effort to confirm the report prior to arresting Valenzuela was to observe, but not talk to, a teller pointing towards Valenzuela as Flores entered the bank. Under these circumstances, we see no reason to substitute Flores's reliance upon a teller pointing in Valenzuela's general direction for actual investigative police work.[8] Finally, assuming that Flores was correct and Valenzuela fit the description Flores had been

6. Without any credible information concerning the origin of the information contained in the police dispatch, "[w]e are left to speculate as to how the dispatch instruction came to be made." *State v. Case,* 884 P.2d 1274, 1278 (Utah Ct.App. 1994).

7. While Flores testified that the report included a description of the suspect's clothing, he was un-

able to recall the details of the description. He was also unable to describe the clothing Valenzuela was wearing at the time of the arrest.

8. As we clearly stated in *Mulcahy,* absent a risk to public safety, we expect police officers to make significant independent corroborative efforts to confirm information from a tip prior to detaining a suspect. *Mulcahy,* 943 P.2d at 236.

given, "[t]his is not corroboration of criminal activity, only of physical characteristics that by themselves have no relevance to criminal activity." *Case,* 884 P.2d at 1279 (footnote omitted).

## CONCLUSION

¶ 31 We conclude that (1) the informant was unidentified and thus his or her report should be viewed on " 'the low end of the reliability scale,' " *Mulcahy,* 943 P.2d at 235 (citation omitted); (2) standing alone, the amount and detail of the information contained in the report were insufficient to permit any more than investigative inquiry; and (3) Flores did little or nothing to corroborate the report prior to arresting Valenzuela.

¶ 32 We further conclude, based on the totality of the circumstances, as demonstrated through this information, that a reasonable and prudent person in Flores's position would not have been justified in believing either that an offense had been committed or that Valenzuela had committed the offense.

¶ 33 Accordingly, we reverse the trial court's denial of Valenzuela's motion to suppress all evidence resulting from the search, and remand for such proceedings as may now be appropriate.

¶ 34 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and JAMES Z. DAVIS, Judge.