2008 UT App 286

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jose Baltarcar ROYBAL, Defendant and Appellant.**

**No. 20060911–CA.**

Court of Appeals of Utah.

July 25, 2008.

Randall W. Richards, Ogden, for Appellant.

Mark L. Shurtleff, atty. gen., and Ryan D. Tenney, asst. atty. gen., Salt Lake City, for Appellee.

Before THORNE, Associate P.J., DAVIS and ORME, JJ.

## OPINION

ORME, Judge:

¶ 1 Defendant Jose Baltarcar Roybal appeals the trial court's denial of his motion to suppress evidence. We conclude that the appeal is well-taken, reverse the denial of the motion to suppress, and remand for a new trial.

## BACKGROUND [1]

¶ 2 Roybal's live-in girlfriend called 911 and reported a domestic dispute. She identi-

---

1. The trial court made some oral factual findings and conclusions of law after the April 18, 2006, evidentiary hearing, but it never entered formal factual findings and conclusions of law. Our recitation of the facts, therefore, is based on the trial court's oral findings and on evidence presented at the evidentiary hearing that supports those findings.

We have jurisdiction to consider the suppression issue, because the trial court's sentence of Roybal "constitutes a final order from which he may appeal." *State v. Norris*, 2002 UT App 305, ¶ 8, 57 P.3d 238 (determining that the Utah Court of Appeals had jurisdiction to consider an appeal from the trial court's denial of the defendant's motion to withdraw a guilty plea, even

fied herself and stated that Roybal had "[j]ust about" assaulted her and that she wanted him out of the house. The dispatch operator asked her if Roybal had been drinking, and she replied that they both had been drinking. She gave no additional information about the quantity or type of alcohol Roybal had consumed or the time period during which he had been drinking. She then told the dispatch operator that Roybal was leaving in a white 1985 GMC van. She also gave the dispatcher Roybal's name, stated that he was fifty-nine and Hispanic, identified the first three letters of the van's license plate, and indicated that he was heading south on Quincy Avenue.

¶ 3 The dispatch center informed Sergeant Ledford of the call, stating that the suspect was "very intoxicated," and Sergeant Ledford started heading toward the house. En route, he saw the described van.[2] He testified that the driver was driving in a manner that indicated he might be intoxicated—he was driving with "slow deliberate movements" and seemed to be trying to avoid Sergeant Ledford. Sergeant Ledford further testified that he followed Roybal long enough to ascertain he was driving in a circular pattern, near the 911 caller's residence. The trial court found that it "was not a circle pattern, but a right-turn pattern." Nonetheless, this driving pattern concerned Sergeant Ledford because, in his experience, people leaving the scene after domestic disputes often drive around the area, waiting to see if the police are going to arrive, before returning to the scene.

¶ 4 After following Roybal for a few blocks, Sergeant Ledford noticed that Roybal was driving below the speed limit, but Sergeant Ledford did not observe any traffic violations.[3] Sergeant Ledford pulled Roybal over. Sergeant Ledford later testified that he "smell[ed] the odor of alcohol coming from

inside the van." Once Roybal exited the van, Sergeant Ledford smelled alcohol on Roybal's breath. Roybal admitted that he had been drinking, and he failed a field sobriety test. Sergeant Ledford arrested him for driving under the influence of alcohol. This prosecution followed.

¶ 5 Roybal moved to "[s]uppress any and all [e]vidence in the . . . case" because "there [was] insufficient reasonable articulable suspicion . . . to initiate [the] motor vehicle stop." A couple of days after the evidentiary hearing, the trial court orally denied Roybal's motion to suppress, concluding that the girlfriend's statement that Roybal had been drinking provided justification for the traffic stop. Roybal later entered a no-contest plea to driving under the influence of alcohol, *see* Utah Code Ann. § 41–6a–502(1) (2005), a third-degree felony in this case, *see id.* § 41–6a–503(2)(b) (Supp.2007), reserving his right to appeal the trial court's denial of his motion to suppress. He now appeals the trial court's suppression decision.

## ISSUE AND STANDARDS OF REVIEW

¶ 6 Roybal argues that the trial court erred in denying his motion to suppress because Sergeant Ledford violated his Fourth Amendment rights by initiating the traffic stop without reasonable suspicion that Roybal was committing a crime. In an appeal from a trial court's denial of a motion to suppress evidence, "we review the trial court's factual findings for clear error and we review its conclusions of law for correctness." *State v. Tiedemann*, 2007 UT 49, ¶ 11, 162 P.3d 1106. "In search and seizure cases, no deference is granted to . . . the [trial] court regarding the application of law to underlying factual findings." *State v. Alverez*, 2006 UT 61, ¶ 8, 147 P.3d 425. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699 ("We abandon the standard which extended 'some defer-

---

though the trial court only orally denied the motion, because the "sentence constitute[d] a final order") (citation and internal quotation marks omitted).

2. Sergeant Ledford also testified that after he stopped the van, he confirmed that the driver matched the physical description given.

3. Generally, a person is considered to commit a traffic violation for driving too slowly only if he or she "impede[s] or block[s] the normal and reasonable movement of traffic" without a legitimate reason for doing so. Utah Code Ann. § 41–6a–605(1) (2005). The trial court determined that while Roybal was driving slowly, he was not driving in an improper manner or violating the law.

ence' to the application of law to the underlying factual findings in search and seizure cases in favor of non-deferential review.").

## ANALYSIS

¶ 7 Roybal contends that the 911 call did not provide reasonable suspicion for the traffic stop because the call was "received from a citizen with unknown reliability" and because "the dispatcher mischaracterized the level of [his] intoxication." The trial court agreed that the dispatch operator mischaracterized the girlfriend's report. This conclusion is inarguable. The girlfriend's statement did not indicate that Roybal was intoxicated at all, much less "very intoxicated." We note, however, that the dispatcher's mischaracterization of the level of intoxication alone does not justify reversal. As long as the dispatch operator had reasonable suspicion at the time of the call that a crime was being committed, or was about to be committed, then the stop, even though effected by a different officer, would be justified. *See State v. Case*, 884 P.2d 1274, 1276–77 (Utah Ct.App.1994). That being said, we agree that there was no reasonable, articulable suspicion to justify the traffic stop and therefore reverse.

■ ¶ 8 "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting U.S. Const. amend. IV). *See Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also* Utah Const. art. I, § 14. An investigatory stop of a vehicle is a level two encounter, *see State v. Johnson*, 805 P.2d 761, 763 (Utah 1991), that is constitutional only if (1) "the officer's initial stop [is] justified" and (2) the officer's "subsequent actions [are] within the scope of the circumstances justifying the stop," [4] *State v. Kohl*, 2000 UT 35, ¶ 10, 999 P.2d 7 (cita-

tions and internal quotation marks omitted). "A stop is justified only if there is a reasonable suspicion that a person is involved in criminal activity." *Id.* ¶ 11. An officer " 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.' " *Id.* (quoting *Kaysville City v. Mulcahy*, 943 P.2d 231, 234 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1997)). We determine whether an officer had the requisite level of suspicion by evaluating the totality of the facts and circumstances. *See id.*

■ ¶ 9 "The specific and articulable facts required to support reasonable suspicion are most frequently based on an investigating officer's own observations and inferences, but under certain circumstances the officer may rely on other sources of information[,]" including "bulletins, or flyers received from other law enforcement sources." [5] *State v. Case*, 884 P.2d 1274, 1276–77 (Utah Ct.App. 1994). A police officer's traffic stop based solely on such other sources is constitutional as long as " 'the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop.' " *Id.* (quoting *United States v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)) (emphasis in original).

¶ 10 "Reasonable suspicion ... is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances' " analysis. *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). We first address the reliability of the call, then consider the content of the information the 911 caller gave the dispatch operator, and finally determine whether Sergeant Ledford's observations alone justified the stop.

---

4. We only address the first of these two elements, as Roybal does not challenge the officer's actions following the stop.

5. "The term 'flyer[]' ... has been taken to mean any information intended to prompt investigation

that is transmitted through police channels, regardless of method." *State v. Case*, 884 P.2d 1274, 1277 n. 4 (Utah Ct.App.1994). The dispatch report based on the 911 call in this case readily falls within this definition.

## I. Reliability of the 911 Call

¶ 11 A court considers several factors when determining the reliability of an informant's tip, including (1) "the type of tip or informant," *Kaysville City v. Mulcahy,* 943 P.2d 231, 235 (Utah Ct.App.), *cert. denied,* 953 P.2d 449 (Utah 1997); (2) "whether the informant gave enough detail about the observed criminal activity to support a stop," *id.* at 236; and (3) "whether the police officer's personal observations confirm the dispatcher's report of the informant's tip," *id.* *See Salt Lake City v. Bench,* 2008 UT App 30, ¶ 14, 177 P.3d 655. When a citizen-informant has some kind of personal involvement with the suspect, the information conveyed is considered less reliable because there is a possibility that the citizen is making allegations out of anger, out of jealousy, or for other personal reasons. *See id.* ¶ 15. This is especially a concern when the informant is a spouse, former spouse, or significant other who recently had an argument or confrontation with the suspect, or who otherwise has a troubled history with the suspect. *See id.* (citing numerous cases in support of this proposition).

¶ 12 With regard to the first factor, the 911 caller identified Roybal as her "[s]ignificant other" and acknowledged they had just had an argument. She conceded that Roybal had not assaulted her, although she said he had been about to, and said, even as he was leaving, that she wanted him out of the house. Given these circumstances, and the fact, as found by the trial court, that the caller sounded intoxicated, the dispatch operator should have been somewhat concerned about the reliability of the information received.

¶ 13 With regard to the second and third reliability factors, the 911 caller did give some details regarding the suspect, the vehicle he was driving, and the direction in which he was traveling. While Sergeant Ledford corroborated some of these details before stopping Roybal, none of these details helped confirm that Roybal was driving while intoxicated—the criminal wrongdoing at issue. *See Case,* 884 P.2d at 1279 (stating that corroborating details relating to a person's physical description "is not corroboration of criminal activity, only of physical characteristics that by themselves have no relevance to criminal activity"). *See also Illinois v. Gates,* 462 U.S. 213, 234, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case."); *State v. Kohl,* 2000 UT 35, ¶ 14, 999 P.2d 7 ("All the State must introduce is evidence showing the informant's tip was reliable, provided sufficient detail of criminal activity, and could be corroborated by police."); *State v. Anderson,* 701 P.2d 1099, 1100, 1102 (Utah 1985) ("[T]he reliability of the informant's information was bolstered by the detail with which the informant described the proposed [marijuana] enclosure. Finally, there was verification of the significant facts by the officer.") (footnotes omitted). Accordingly, we conclude that the informant's tip to the 911 operator was of questionable reliability.

## II. Information Provided in the 911 Call

¶ 14 Roybal's girlfriend only reported that Roybal had been drinking without indicating the quantity or type of alcohol he consumed or for how long he had been drinking. She also did not provide any information regarding his weight. The trial court, after listening to the 911 recording, determined that the *caller* sounded intoxicated and that it was reasonable to conclude that both she and Roybal had been drinking. Based on these facts, the court determined that the stop was justified.

¶ 15 However, the statement that a person has been drinking, by itself—with no other facts regarding the amount of alcohol consumed, the type of beverage consumed, or the period of time over which the person consumed the alcohol, or the person's physical size—does not provide an adequate basis on which to rationally infer that the person has an alcohol level beyond the legally proscribed limit, *see* Utah Code Ann. § 41-6a-502(1)(a), (c) (2005), or that the person consumed alcohol to the extent that he or she could not safely drive a vehicle, *see id.* § 41–

6a–502(1)(b). *See also State v. Markland,* 2005 UT 26, ¶ 10, 112 P.3d 507 ("[T]he officer's suspicion must be supported by specific and articulable facts and rational inferences, and cannot be merely an inchoate and unparticularized suspicion or hunch[.]") (citations and internal quotation marks omitted). People frequently drink alcohol without becoming intoxicated. From the information the caller gave, the dispatch operator knew that the suspect was a fifty-nine-year-old Hispanic man but had no information regarding his weight. He could have been three-hundred pounds and consumed only two or three light beers over the course of several hours. If so, two or three light beers would probably not have affected his ability to safely operate a vehicle or caused his blood alcohol level to rise above the proscribed limit. The caller's statements, therefore, provided no information from which the dispatch operator could *reasonably* infer that Roybal—as opposed to the caller—had consumed alcohol to the point that he was committing a crime by driving a vehicle. Accordingly, we conclude that the information given by the 911 caller did not provide the dispatch operator with reasonable, articulable suspicion to justify the traffic stop, and it therefore did not provide Sergeant Ledford with such justification. *See Salt Lake City v. Bench,* 2008 UT App 30, ¶¶ 19–20 & n. 4, 177 P.3d 655.

### III. Sergeant Ledford's Own Observations

█ ¶ 16 Finally, we address whether Sergeant Ledford's own observations provided reasonable, articulable suspicion for the stop. Sergeant Ledford did not observe swerving, driving over the center line, or other unsafe driving patterns from which he could have reasonably inferred that Roybal was driving while intoxicated. *See State v. Despain,* 2007 UT App 367, ¶ 10, 173 P.3d 213. Rather, Sergeant Ledford only observed Roybal driving in a slow, cautious manner. While he testified such driving is consistent with intoxication, we recently discussed in *Salt Lake City v. Bench* that cautious driving and endeavoring to avoid a police encounter do not

establish a reasonable, articulable suspicion that a person is driving while intoxicated. *See* 2008 UT App 30, ¶¶ 11–13, 177 P.3d 655. *See also State v. Talbot,* 792 P.2d 489, 494 n. 11 (Utah Ct.App.1990). Drivers committing no crimes whatsoever routinely slow down when they see a police car. It is human nature to do so and not suggestive of criminality.

### CONCLUSION

¶ 17 When considering the totality of the circumstances of this case—especially that the tip itself was not reliable, that the content of the information conveyed did not provide reasonable suspicion, and that Sergeant Ledford's own observations provided no information from which he could reasonably suspect that Roybal was driving while intoxicated—we conclude that there was no justification for the traffic stop. The trial court inappropriately denied Roybal's motion to suppress evidence because the dispatch operator, and therefore Sergeant Ledford, did not have reasonable, articulable suspicion that Roybal was committing a crime. The information conveyed in the call by Roybal's live-in girlfriend lacked sufficient reliability because the caller was potentially biased, apparently inebriated, and did not provide meaningful detail regarding the crime that was supposedly being committed. Furthermore, the content of the information provided did not provide any details that indicated Roybal was legally intoxicated and committing a crime when he drove his vehicle. While Sergeant Ledford's own observations did corroborate some ancillary details provided by the caller, none of his observations corroborated the essence of the complaint, i.e., that Roybal was driving while intoxicated. We accordingly reverse and remand for a new trial or such proceedings as are now appropriate.[6]

¶ 18 I CONCUR: JAMES Z. DAVIS, Judge.

---

**6.** The State argues that Sergeant Ledford had an independent reason to stop Roybal because the 911 caller's statements indicated that an assault might have occurred. We disagree. In response

to the dispatch operator's first question about whether she had been assaulted, the caller stated that she had "[j]ust about" been assaulted. However, when dispatch asked a second time if

THORNE, Judge (dissenting):

¶ 19 I respectfully dissent. I do not agree with the majority that there was no reasonable, articulable suspicion to justify the traffic stop. Rather, I think that the information Roybal's girlfriend conveyed to the 911 dispatcher, together with the inferences that can be drawn therefrom, establish a reasonable suspicion that Roybal was driving while intoxicated sufficient to justify the traffic stop on that basis alone. It is true that the citizen informant in this case identified herself as Roybal's "[s]ignificant other" and acknowledged that they had just had a heated argument, which may render the information conveyed less reliable. Nevertheless, the information conveyed should not be discarded merely on the possibility of bad motive. Courts should evaluate the specific and articulable facts required to support reasonable suspicion in their totality, rather than looking at each fact in isolation. *See State v. Worwood*, 2007 UT 47, ¶ 23, 164 P.3d 397.

¶ 20 The totality of the information conveyed to the dispatcher, including the girlfriend's intoxicated demeanor and statement that she and Roybal had both been drinking, establishes that the dispatcher had reasonable suspicion that Roybal was driving while intoxicated. Given these circumstances, and after reviewing the audio of the 911 call, the trial judge concluded that the dispatcher could have reasonably inferred that Roybal and his girlfriend had been drinking together, the girlfriend was intoxicated, and Roybal, who had just left the house, was in fact also intoxicated and driving.

¶ 21 While the girlfriend's unhappy personal relationship with Roybal may, as with the informant in *Salt Lake City v. Bench*, 2008 UT App 30, 177 P.3d 655, call into question her reliability, *see id.* ¶¶ 14–16, it does not obviate the facts. Unlike the situation in *Bench*, the 911 audio demonstrates that Roybal's girlfriend was intoxicated. When coupled with the information that the parties had been drinking together, the dispatcher possessed sufficient information to reasonably infer that Roybal was intoxicated. Al-

though Roybal's girlfriend did not provide the dispatcher with specific information about how much alcohol Roybal had actually consumed, the dispatcher could reasonably infer from the girlfriend's statement that the parties had been drinking together and that the girlfriend had actually witnessed Roybal drinking. Additionally, the girlfriend's intoxicated demeanor would also suggest that Roybal may be intoxicated as well. Thus, even if the girlfriend had a nonobjective motive, the dispatcher could reasonably conclude that the facts and circumstances raised an inference that Roybal was also intoxicated. This is sufficient to establish reasonable suspicion.

¶ 22 Based on the entirety of the information available to the dispatcher, I would conclude that the dispatcher had reasonable suspicion, despite any reliability issues that may have been present, sufficient to alert officers of an intoxicated driver. I would conclude that the traffic stop was permissible and therefore would affirm the trial court.

---

she had been assaulted, she clarified that she had not been. The trial court did not base its ruling on this aspect of the call, and the facts conveyed

by the caller as to her nonphysical confrontation with Roybal would not support the traffic stop on the alternative basis urged by the State.