2005 UT App 261

**STATE of Utah, Plaintiff and Appellee,**

v.

**Clifton YAZZIE, Defendant and Appellant.**

No. 20040285–CA.

Court of Appeals of Utah.

June 9, 2005.

William L. Schultz, Moab, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Christine Soltis, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before Judges JACKSON, ORME, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 Clifton Yazzie appeals from his convictions for driving under the influence of alcohol, operating a motor vehicle without operator's security, and driving on a suspended or revoked operator's license. Because we conclude that Yazzie's detention was not supported by a reasonable articulable suspicion of wrongdoing on his part, we reverse.

## BACKGROUND

¶ 2 On October 15, 2003, Chief Mike Halliday, of the Blanding City Police Department (BPD), saw Yazzie driving through town. Halliday was surprised by the sight of Yazzie behind the wheel. Over the years, Halliday, as well as other members of the BPD, had encountered Yazzie on a number of occasions—most involving alcohol—and Yazzie had never produced a driver license when asked for identification. Suspecting that Yazzie had no license to drive, Halliday decided to stop him. He pulled his patrol car behind Yazzie and followed him for about four blocks, during which time Yazzie committed no moving violations.[1] Halliday then initiated a traffic stop, ostensibly to investigate his "suspicion" that Yazzie was driving without a license.

¶ 3 When asked, Yazzie provided Halliday with an Arizona driver license, which Halliday determined to be valid. However, during his brief contact with Yazzie to procure the license, Halliday concluded that he had smelled alcohol. Consequently, although the Arizona license proved to be valid, Halliday ordered Yazzie from the car, where he performed a number of field sobriety tests, all of which Yazzie failed. At about this time, another officer of the BPD requested that dispatch check with Utah records concerning Yazzie's driving privileges. Through this

---

1. The State asserts that Halliday testified "he immediately stops anyone he suspects of driving without a license. In this case, he attempted to do so, but the two cars traveled about four Blanding blocks before defendant actually stopped." The record, however, raises questions about the State's factual assessment. Halliday testified on direct examination as follows:

> Q: What goes through your mind, with regard to seeing [Yazzie] behind the wheel?
> A: Ah, the first thing that I thought of is that he did not—did not have a driver's license. I would have bet anything that he had no driver's license.
> The Court: Even if you were [giving] odds? Even if you had to give odds?
> A: I would have gave odds.
> Q: All right. You stopped him.
> A: Yes.

Then, during cross examination, Halliday testified to the following:

> Q: All right. And, ah, on—on this day in question, you see [Yazzie] and you see him operating a vehicle and you recognize him because you've known him for at least 20 years; is that right?
> A: Yes.

> . . . .
> Q: From the time you saw him to the time you actually affected—that you pulled him over—started to pull him over, how many blocks was it?
> A: Um, four, maybe.
> Q: It was about four blocks? So when you saw him driving, what is it that went through your mind? What is it that you said to yourself?
> A: He—he does not have a driver's license to be operating a vehicle.
> . . . .
> Q: Okay. So what did you do when you saw that? . . . .
> A: I did the same thing I would do with anybody else that I believed to not have a driver's license.
> Q: And that is pull him over?
> A: Stop and check it.

The testimony suggests that Halliday decided to stop Yazzie when he first saw him behind the wheel, and that he did so after following him for about four blocks. Thus, although we are uncertain of its materiality, we cannot accept the State's version of the events surrounding the stop.

check, it was discovered that Yazzie also had a Utah driver license, but that it had been suspended for alcohol-related offenses.

¶ 4 Yazzie was arrested and his blood alcohol tested. The results of the test showed that Yazzie was well over the legal limit. He was subsequently charged with driving under the influence of alcohol, operating a motor vehicle without operator's security, and driving on a suspended or revoked operator's license. Prior to his trial on these charges, Yazzie filed a motion to suppress all of the evidence that was discovered during the traffic stop, arguing that the stop was not supported by any reasonable suspicion of illegal activity. The trial court, following a hearing on the motion that consisted only of Halliday's testimony, denied the motion. Yazzie then entered a conditional guilty plea to the charges. He now appeals.

## ISSUE AND STANDARD OF REVIEW

 ¶ 5 Yazzie argues that his initial detention was not supported by reasonable articulable suspicion and that the trial court erred in concluding to the contrary. When reviewing a trial court's decision concerning a defendant's motion to suppress, we review its factual findings for clear error, but, to ensure that search and seizure standards are applied similarly throughout the state, we review its legal conclusions for correctness, giving no deference to the court's application of the law to the facts. *See State v. Brake,* 2004 UT 95,¶¶ 12–15, 103 P.3d 699; *see also State v. Hansen,* 2002 UT 125,¶ 26, 63 P.3d 650 ("State-wide standards also help ensure different trial judges will reach the same legal conclusion in cases that have little factual difference.").

## ANALYSIS

 ¶ 6 Yazzie argues that Halliday's rationale for stopping him was insufficient for constitutional purposes, and therefore that all evidence resulting from the stop should have been suppressed. " 'Stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of [the Fourth] Amendment[ ], even though the purpose of the stop is limited and the resulting detention quite brief.' " *State v. Hansen,*

2002 UT 125,¶ 28, 63 P.3d 650 (alterations in original) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)); *see also United States v. Tibbetts,* 396 F.3d 1132, 1136 (10th Cir.2005) ("A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.' " (citation omitted)). Therefore, such an action is justified only "if there is a reasonable suspicion that the [occupant of the vehicle] is involved in criminal activity," and "the State bears the initial burden for establishing the articulable factual basis for the reasonable suspicion necessary to support an investigatory stop." *State v. Case,* 884 P.2d 1274, 1276 (Utah Ct.App.1994).

 ¶ 7 In general, "[t]he specific and articulable facts required to support reasonable suspicion are ... based on an investigating officer's own observations and inferences." *Id.* at 1276–77. "Reasonable suspicion is 'a particularized and objective basis' for suspecting the person stopped of criminal activity," *Tibbetts,* 396 F.3d at 1138, and whether or not a detention is supported by reasonable suspicion is determined by examining the totality of the circumstances, not through an examination of each individual fact. *See State v. Brake,* 2004 UT 95,¶ 38, 103 P.3d 699 (concluding that the totality of the circumstances did not support a police officer's warrantless search of the interior of an automobile for weapons). In the case of a traffic stop, such an action is reasonable and the initial seizure will be found to be sound if the defendant commits a traffic offense in the officers presence, *see Hansen,* 2002 UT 125 at ¶ 30, 63 P.3d 650, or if the officer has an articulable " 'reasonable suspicion' that [the defendant has] violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *Tibbetts,* 396 F.3d at 1137 (citation omitted).

¶ 8 In the instant case, Halliday testified at the suppression hearing, where he described the circumstances surrounding the stop, and articulated his reasons for detaining Yazzie. Halliday testified that he saw Yazzie driving

through town, something that he had never seen before. He pulled behind Yazzie's car and followed him for about four blocks, during which time he noted that Yazzie committed no moving violations. He then executed a traffic stop. To justify his decision to detain Yazzie, Halliday testified that he made the stop because he was convinced that Yazzie did not have a driver license.[2] He based his conclusion on his previous encounters with Yazzie—which he estimated amounted to ten or more—as well as Yazzie's contact with other officers of the BPD. Halliday testified that the BPD had encountered Yazzie "well over a hundred" times in the preceding twenty years, mainly for crimes that involved alcohol, and Yazzie had never produced a driver license on any of these occasions; not with Halliday, and not with any other officer of the BPD. However, Halliday also testified that he was not certain whether he had ever specifically asked Yazzie to produce a driver license, and he had never been involved in any sort of encounter with Yazzie that involved a traffic violation of any kind.[3] Finally, Halliday testified that his last encounter with Yazzie had happened between one and two years before the date of the traffic stop.

¶ 9 Whether taken individually or as a whole, the circumstances articulated by Halliday do not support Yazzie's detention. The State, in its effort to urge the opposite conclusion, points us to *State v. Markland*, 2005 UT 26, ¶¶ 16–26, 112 P.3d 507. However, *Markland* is easily distinguished. In *Markland*, a police officer was dispatched to a neighborhood at 3:00 AM, following a 911 report of a scream heard in the area. *See id.* at ¶ 20. When he arrived, the officer observed the defendant walking down a dimly lit, dead-end street with two cloth bags swinging from his shoulders. *See id.* The officer approached the defendant and asked him a few questions, but the defendant's answers were, to the officer, "inconsistent with the observable facts." *Id.* at ¶ 21. Thus, the officer detained the defendant to

run a warrant check, and to check his background for any indication of past violence. *See id.* In concluding that the officer's detention of the defendant was reasonable, our supreme court relied on the 911 report of a scream in the area, the fact that the defendant was the only individual to be found in the area of the scream, his presence near the reported scream on a dimly lit dead end street, and that when questioned, his answers did not comport with the circumstances observed by the officer. *See id.* at ¶¶ 20–21, 25 n. 2.

¶ 10 In contrast, not only are the factual settings of this case and *Markland* extremely dissimilar, but here the State has presented us with no circumstances that existed *at the time of Halliday's decision to stop Yazzie* that suggest Yazzie was involved in any illegal activity, let alone circumstances sufficient to justify the detention. Although the State would have us accept Halliday's history of contact with Yazzie as a very strong factor, it is, under these circumstances, virtually immaterial to the question of reasonable suspicion. Granted, Halliday testified that he was aware of a great number of encounters between Yazzie and law enforcement over a twenty-year period—including at least ten encounters between Halliday and Yazzie—but none in the year or more before the day of the detention, and none involving a driving offense. Furthermore, Halliday could not recall having ever requested Yazzie's driver license, and, most importantly, apparently he had never had reason to check on the status of Yazzie's driving privileges.

¶ 11 The State also would have us accept as a contributing factor to Halliday's suspicion his testimony that he had never seen Yazzie driving a car before. But this is also of no relevance to the question at hand. Halliday clearly did not shadow Yazzie's every move, and the mere fact that Halliday had not previously witnessed Yazzie as a driver is not an indicator that Yazzie was not licensed to drive. The State points us to no

---

**2.** In fact, Halliday testified that he "would have bet anything that [Yazzie] had no driver's license."

**3.** It is clear from the record that none of Halliday's prior encounters with Yazzie involved a

circumstance where Yazzie would be expected to produce a driver license, let alone a situation where asking for a license, as opposed to simple identification, would have been warranted.

factor, or group of factors, which, taken as a whole, support Halliday's decision to detain Yazzie. Consequently, we conclude that the trial court erred in denying Yazzie's motion to suppress the evidence that resulted from the detention.

## CONCLUSION

¶ 12 The State failed to prove that Halliday had sufficient articulable facts to form the requisite reasonable suspicion necessary to justify the traffic stop. In absence of such a showing, we are left with a strong impression that Halliday's decision to detain Yazzie was based on nothing more than a hunch, a guess, or a "bet." Therefore, we conclude that the trial court erred in denying Yazzie's motion to suppress.

¶ 13 Accordingly, we reverse Yazzie's convictions and remand this case to the trial court for proceedings consistent with this decision.

¶ 14 WE CONCUR: NORMAN H. JACKSON and GREGORY K. ORME, Judges.