2008 UT App 90

STATE of Utah, Plaintiff and Appellee,

v.

Joe Arthur MARTINEZ Jr., Defendant
and Appellant.

No. 20061010–CA.

Court of Appeals of Utah.

March 13, 2008.

386

## OPINION

**McHUGH, Judge:**

¶ 1 Joe Arthur Martinez Jr. appeals his conviction and the trial court's denial of his motion to suppress evidence. Martinez argues that the trial court erred when it denied his suppression motion because police officers effectuated a traffic stop of a vehicle in which Martinez was a passenger without reasonable, articulable suspicion of criminal behavior and, therefore, violated his constitutional rights under the federal and Utah constitutions. We affirm.

## BACKGROUND

¶ 2 Because of the fact-dependent nature of search and seizure inquiries, we review the relevant facts in detail.[1] On February 2, 2006, the cashier of an Ogden Texaco service station called the Weber County Sheriff's Office to report that suspicious individuals were pacing outside of the store. At the suppression hearing, Deputy Michael Streker testified that the cashier described three individuals—one female wearing a gray hoodie and two males, one of whom was wearing a beanie. According to Deputy Streker, the cashier stated that "the female would walk up to the ... front doors, and when a customer would walk in, the female would then walk away to the east side of the building where the two males were located." As Deputy Streker arrived at the Texaco to investigate, within two minutes of the cashier's call, dispatch notified him that two of the individuals had just left the Texaco as passengers in a tan, gold, or beige car. Dispatch gave him the license plate number, and almost immediately thereafter, he located and stopped the vehicle.[2] The backseat passengers matched the description given by the cashier, and Deputy Streker testified that

Randall W. Richards, Ogden, for Appellant.

Mark L. Shurtleff, atty. gen., and Marian Decker, asst. atty. gen., Salt Lake City, for Appellee.

Before GREENWOOD, P.J., THORNE, Associate P.J., and McHUGH, J.

1.  "We state the facts in a light most favorable to the trial court's ruling denying [a] motion to suppress." *State v. Marquez*, 2007 UT App 170, ¶ 2, 163 P.3d 687 (internal quotation marks omitted) (alteration in original). *But cf. United States v. Leos–Quijada*, 107 F.3d 786, 792 (10th Cir.1997) ("In reviewing the denial of a motion to suppress, we ... view the evidence in the light most favorable to the government.").

2.  Deputy Streker testified that after dispatch advised him that the suspicious individuals had left the Texaco and were headed east, he "drove right into the Texaco parking lot and then continued right back out and headed eastbound on 21st Street and pulled behind th[eir] vehicle."

they were "looking back at [him] and then facing forward and putting their hands down toward the seat and the floorboard area." [3] He also testified that he believed this was more than just a typical suspicious persons report. According to the deputy, there were three convenience store robberies in the area within a two-week period prior to this incident. The "vehicles involved [in two of those robberies] were either gold, tan or beige, [and] mid-size to compact," and the individuals involved were "a female and one to two males." [4] Also, a third Ogden robbery involving a "tan, gold or beige mid-size compact vehicle" occurred not far from the other two robberies and twenty minutes after one of the other robberies, but outside of the Weber County Sheriff's jurisdiction. Additionally, rifles were used in all three robberies. After stopping the car, Deputy Kimberly Rodell arrived to assist. A check on the four occupants revealed that a no-bail warrant had been issued against Martinez. A search of Martinez and his backpack incident to arrest uncovered marijuana and other controlled substances.

3. Deputy Streker testified that, at the time he was pulling over the car, Martinez and the other backseat passenger were "moving their arms around and bending forward ... like they were putting something down at their feet on the floorboard." Such conduct alone, however, does not establish reasonable, articulable suspicion. *See State v. Schlosser*, 774 P.2d 1132, 1137–38 (Utah 1989) ("Mere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity. [The defendant]'s movements, turning to the left and to the right, appearing fidgety, bending forward, and turning to look at the officer, do not, without more, show a reasonable possibility that criminal conduct had occurred or was about to occur." (citations omitted)).

4. Deputy Streker filed a supplemental police report because his original report did not contain information about the recent convenience store robberies. According to Deputy Streker, he inadvertently left that information out of the initial report. He testified, however, that his sergeant arrived at the scene of Martinez's arrest and contacted the detectives investigating the previous robberies, who eventually responded and questioned Martinez and his companions. The trial court found the supplemental report and Deputy Streker's testimony credible and persuasive, noting that, but for the supplemental police report, it would have granted Martinez's motion to suppress.

## ISSUE AND STANDARDS OF REVIEW

¶ 3 Martinez argues that his constitutional rights were violated when Deputy Streker stopped the vehicle in which he was a passenger.[5] We review a trial court's denial of a defendant's motion to suppress for correctness, "giving no deference to the [trial] court's application of the law to the facts." *State v. Yazzie*, 2005 UT App 261, ¶ 5, 116 P.3d 969; *see also State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699 ("We abandon the standard which extended 'some deference' to the application of law to the underlying factual findings in search and seizure cases in favor of non-deferential review.").[6] We do, however, extend deference to a trial court's factual findings. *See Yazzie*, 2005 UT App 261, ¶ 5, 116 P.3d 969 ("When reviewing a trial court's decision concerning a defendant's motion to suppress, we review its factual findings for clear error....").

## ANALYSIS

¶ 4 The Fourth Amendment protects a person's right to be free from "unrea-

5. Although Martinez asserts that the police violated both the U.S. and Utah constitutions, he did not argue that the analyses under both constitutions "are dissimilar or distinct as applied in this case, nor did he argue that the Utah Constitution affords him greater protection than the United States Constitution." *State v. Trane*, 2002 UT 97, ¶ 21 n. 2, 57 P.3d 1052. "If a party fails to support his or her state constitutional arguments with analysis and legal authority the appellate court will not address them." *State v. Bean*, 869 P.2d 984, 988–89 (Utah Ct.App.1994). Therefore, we review the issue on appeal "only under the federal constitution and existing Utah precedent in which this court has applied article I, section 14 of the Utah Constitution," *Trane*, 2002 UT 97, ¶ 21 n. 2, 57 P.3d 1052, and will "not engage in an independent state constitutional analysis," *Bean*, 869 P.2d at 989.

6. Many of the cases cited in this opinion were decided prior to *State v. Brake*, 2004 UT 95, 103 P.3d 699, and therefore a more deferential standard of review may have been used. *See, e.g.*, *State v. Bruce*, 779 P.2d 646 (Utah 1989); *State v. Carpena*, 714 P.2d 674 (Utah 1986) (per curiam); *State v. Swanigan*, 699 P.2d 718 (Utah 1985) (per curiam); *State v. Baumgaertel*, 762 P.2d 2 (Utah Ct.App.1988); *State v. Trujillo*, 739 P.2d 85 (Utah Ct.App.1987).

sonable searches and seizures." *See* U.S. Const. amend. IV. We recognize three levels of reasonable police stops:

> (1) An officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an articulable suspicion that the person has committed or is about to commit a crime ...; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense had been committed or is being committed.

*State v. Markland*, 2005 UT 26, ¶ 10 n. 1, 112 P.3d 507 (quoting *State v. Johnson*, 805 P.2d 761, 763 (Utah 1991)). Both the State and Martinez agree that the stop at issue on appeal was a level-two encounter. Before a police officer can effectuate such a seizure, he or she "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *accord Markland*, 2005 UT 26, ¶ 10, 112 P.3d 507 ("[I]t is settled law that 'a police officer may detain and question an individual when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.' ... [T]he officer's suspicion must be supported by 'specific and articulable facts and rational inferences.'" (citation omitted) (quoting *State v. Chapman*, 921 P.2d 446, 450 (Utah 1996); *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir.1990))); *see also* Utah Code Ann. § 77–7–15 (2003) ("A peace officer may stop any person in a public place when he has a reasonable suspicion to believe *he has committed or is in the act of committing or is attempting to commit* a public offense and may demand his name, address and an explanation of his actions." (emphasis added)). Such reasonable, articulable suspicion of criminal activity must be "based on objective facts." *State v. Trujillo*, 739 P.2d 85, 88 (Utah Ct.App.1987) (internal quotation marks omitted). However, "an officer is not obligated to rule out innocent conduct prior to initiating an investigatory detention." *Markland*, 2005 UT 26, ¶ 17, 112 P.3d 507.

¶ 5 The United States Supreme Court has further clarified the term "reasonable, articulable suspicion":

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. *The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.* From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> ....
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described *must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.* ...

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (emphasis added). In other words, "some minimal level of objective justification for making the stop" is required—a level that "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted).

¶ 6 Thus, the only issue in this case is whether the officer who stopped the vehicle had reasonable, articulable suspicion that Martinez and his companions had committed any of the recent convenience store robberies in the area, were planning or attempting to rob the Texaco station, or both. Martinez first argues that the articulation of Deputy Streker's reasonable suspicion must be limited to only those facts he personally observed or independently verified. We disagree.

¶ 7 "[P]olice officers can rely on a dispatched report in making an investigatory stop," as long as "the dispatched report contain[s] articulable facts to support a finding of reasonable suspicion." *State v. Pena*, 869

P.2d 932, 940 (Utah 1994); *see also State v. Bruce*, 779 P.2d 646, 650–51 (Utah 1989) (determining police broadcast contained "other sufficient information ... and 'articulable facts' ... to support at least a 'reasonable suspicion'"). When the dispatched report is based on a call from an eyewitness, the officer is entitled to rely on that report so long as it contains sufficient articulable facts and the witness is reliable. *See Pena*, 869 P.2d at 940 (concluding dispatched report supported a determination of reasonable, articulable suspicion where the report was based on a 7–Eleven clerk's call to the police department); *cf. United States v. Leos–Quijada*, 107 F.3d 786, 792 (10th Cir.1997) ("A confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur." (citing *Alabama v. White*, 496 U.S. 325, 328–30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *United States v. Elkins*, 70 F.3d 81, 83 (10th Cir. 1995))); *State v. Case*, 884 P.2d 1274, 1278–79 (Utah Ct.App.1994) (holding that reasonable, articulable suspicion did not exist because "[t]he source and content of the information which prompted the broadcast are simply unknown").

¶ 8 Deputy Streker relied on a dispatched report based on a call from the cashier at the Texaco. The cashier was "a reliable source," given her status as an unbiased, "identified citizen-informant."[7] *Salt Lake City v. Bench*, 2008 UT App 30, ¶ 15, 177 P.3d 655; *see also Kaysville City v. Mulcahy*, 943 P.2d 231, 235 (Utah Ct.App. 1997) (explaining why "an identified 'citizen-informant' is high on the reliability scale"). *See generally id.* at 234–36 (listing the "three factors to consider in determining the reliability and sufficiency of [an] informant's report"). Therefore, Deputy Streker was not required to further corroborate the cashier's information.

¶ 9 Moreover, even if Deputy Streker were required to corroborate the witness's report, he did so in this case. Deputy Streker arrived at the scene two minutes after he received the dispatched report and found "the person[s], the vehicle and the location substantially as described by the informant." *Mulcahy*, 943 P.2d at 236 (internal quotation marks omitted); *see also id.* (stating that "less corroboration is necessary" where the information's reliability "is increased" (internal quotation marks omitted)). Accordingly, Deputy Streker properly relied on the facts observed by the cashier and included in the dispatched report when determining whether or not reasonable articulable suspicion existed.

¶ 10 Even considering all of the facts contained in the dispatched report and the additional facts known to Deputy Streker, the issue of whether or not reasonable articulable suspicion existed at the time of the stop poses a close question. Our decision turns on the factual nuances of this case as compared to those from other authoritative search and seizure cases.

¶ 11 In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court concluded that reasonable, articulable suspicion existed where an officer conducted an investigatory stop and pat-down search after observing three men acting suspiciously. *See id.* at 5–6, 28, 88 S.Ct. 1868. The Supreme Court distinguished the suspicious conduct in *Terry* from conduct that would merely be indicative of usual or innocent conduct:

> There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the

---

7. Martinez does not argue that the cashier was not a reliable source.

two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.

*Id.* at 22–23, 88 S.Ct. 1868. The *Terry* Court held that the officer's detention of the three men and subsequent search for weapons were not violations of the Fourth Amendment, *see id.* at 30–31, 88 S.Ct. 1868, even though the officer stopped them "a couple of blocks away" from the store, *see id.* at 23, 88 S.Ct. 1868. The Court noted that "[a]lthough the trio had departed the original scene, there was nothing to indicate abandonment of an intent to commit a robbery *at some point.*" *Id.* at 28, 88 S.Ct. 1868 (emphasis added).

¶ 12 The facts here are similar to those in *Terry*. The suspects in *Terry* were loitering around a store and repeatedly peering through its windows. *See id.* at 6, 88 S.Ct. 1868. The United States Supreme Court stated that such conduct warrants "further investigation." *Id.* at 23, 88 S.Ct. 1868. In both *Terry* and this case, "th[e suspicious] conduct was by itself lawful, but it also suggested that the individuals were *casing the store for a planned robbery.*" *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (discussing *Terry,* 392 U.S. at 5–6, 88 S.Ct. 1868); *see also United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("The [reasonable suspicion] analysis proceeds with various objective observations, information from police reports, if such are available, and *consideration of the modes or patterns of operation of certain kinds of lawbreakers.*"). The *Terry* Court "recognized that the officers could de-

tain the individuals to resolve the ambiguity" created by suspicious conduct that was "susceptible of an innocent explanation." *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673 (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). And therefore, "*Terry* accepts the risk that officers may stop innocent people." *Id.* at 126, 88 S.Ct. 1868.

¶ 13 In addition, the facts and time line of this case are similar to those present in *Terry.* First, the officer stopped the vehicle in which Martinez was a passenger on the same street where the Texaco is located. Likewise, although the officer in *Terry* stopped the suspicious men on a different—but adjoining—street, the stop occurred "a couple of blocks away" from where they were peering in the window.[8] *See* 392 U.S. at 23, 88 S.Ct. 1868. Second, in both cases, the suspicious individuals were not involved in the actual commission of a crime. Instead, the officers stopped the individuals out of concern that a crime was going to occur "at some point." *Id.* at 28, 88 S.Ct. 1868.

¶ 14 The *Terry* Court, however, also stated that "further investigation" is warranted when "two men hover about a street corner for an extended period of time, *at the end of which it becomes apparent that they are not waiting for anyone or anything.*" *Id.* at 23, 88 S.Ct. 1868 (emphasis added). Arguably then, *Terry* is distinguishable from the instant case because Martinez and his companion left in a car for which they were apparently waiting. Upon a close reading of *Terry,* however, the distinction is not as compelling. The men in *Terry* also left the storefront where they had been exhibiting suspicious behavior. Nevertheless, the United States Supreme Court concluded that "[a]lthough the trio had departed the original scene, there was nothing to indicate abandonment of an intent to commit a robbery *at some point.*" *Id.* at 28, 88 S.Ct.

---

**8.** According to a map recreated in a law review article discussing *Terry,* the distance between where the suspicious men were looking in the store window and where they were stopped by the officer was approximately 650 to 800 feet. *See* John Q. Barrett, *The Street Locations: Downtown Cleveland, October 31, 1963,* 72 St. John's L.Rev. app. A at 1384–85 (1998).

Unfortunately, the record here does not contain information about how long it took to locate the vehicle or how far away it was from the Texaco when stopped. The record does include the address of the Texaco—1514 West 2100 South—and the approximate location of the stop—1000 West 2100 South. Thus, it appears that Deputy Streker detained Martinez approximately five blocks from the Texaco.

1868 (emphasis added). Although Martinez and his companions did leave the scene, the car they left in and the cashier's report of a female and two males matched the general description of the automobile used and the individuals involved in the recent convenience store robberies in the same area within a two-week period. These additional facts regarding the recent robberies support reasonable suspicion beyond that established in *Terry*. Rather than dispelling suspicion, the appearance of Martinez's ride increased it because the vehicle matched that used in the recent robberies. Deputy Streker's belief that Martinez and his companions were involved in the recent convenience store robberies, in combination with their suspicious behavior, created reasonable, articulable suspicion.

¶ 15 Although the similarities with *Terry*— as well as the additional facts that exist in the present case—convince us that Deputy Streker's actions were consistent with the Fourth Amendment, a review of similar Utah cases is also informative.

¶ 16 In *State v. Markland*, 2005 UT 26, 112 P.3d 507, an officer heard a dispatched report of screams or cries for help in the area. *See id.* ¶ 2. Upon his arrival five minutes later, the officer observed a man with two shoulder bags walking toward the dead-end of a poorly lit street. *See id.* He conducted an investigatory stop, during which he questioned the man about whether he heard anything and where he was going. *See id.* ¶ 3. Because he was walking in the direction of a dead-end, the officer did not believe the man's explanation that he was on his way home, which the man stated was located about twenty blocks away. *See id.* The officer therefore asked the man for identification and ran a warrants check—which revealed an outstanding warrant. *See id.* ¶ 4. The trial court denied the defendant's motion to suppress the drugs found in a search incident to the arrest on the outstanding warrant. *See id.* ¶ 5. This court reversed on grounds very similar to those argued by Martinez here. *See id.* ¶ 1. On certiorari, the Utah

Supreme Court held that reasonable, articulable suspicion did exist for the detention and reinstated the trial court's decision. *See id.*

¶ 17 In *Markland*, there were fewer factors pointing toward reasonable, articulable suspicion than in the present case. The call to police about screaming in the area did not provide any additional information. Police, who arrived within five minutes of the call, had no idea who screamed, from where it emanated, or why the unknown person screamed.[9] Further, even assuming a crime had been committed, there was nothing whatsoever to identify Markland specifically as a possible suspect. *See id.* ¶ 2. Additionally, there is no discussion about the source of the call, and thus no analysis as to its reliability. *See id.* ¶ 25 n. 2; *see also id.* ¶¶ 38–41 (Durham, J., dissenting). Recognizing that the lateness of the hour alone is not sufficient to support reasonable, articulable suspicion, *see, e.g., State v. Carpena*, 714 P.2d 674, 675 (Utah 1986) (per curiam); *State v. Swanigan*, 699 P.2d 718, 719 (Utah 1985) (per curiam), the Utah Supreme Court also relied upon the fact that *Markland* was walking toward a dead-end, causing the officer to surmise that he was not being truthful about his activities. *See Markland*, 2005 UT 26, ¶ 3, 112 P.3d 507. Based on these facts, the supreme court held that the officer's detention of Markland did not violate the Fourth Amendment. Here, Deputy Streker had much more information on which to rely: a description of the number of suspects, their genders, and the vehicle used during the prior robberies; the cashier's report of the individuals engaged in suspicious conduct at the Texaco whose numbers and genders matched that description; and the cashier's description of the vehicle that collected the suspicious individuals from the Texaco, which matched the general description of the automobile used during the prior robberies.

¶ 18 The Utah Supreme Court also held that the circumstances supported reasonable, articulable suspicion in *State v. Bruce*, 779 P.2d 646 (Utah 1989). In that case, the clerk of a convenience store received an anony-

---

9. The sounds were heard "near the eastern end of the ... apartment complex." *State v. Mark-* *land*, 2005 UT 26, ¶ 2, 112 P.3d 507.

mous phone call from a male who claimed he was pointing a gun at her. *See id.* at 647. The man told the clerk to take all of the money from the register, put it into a bag, and give it to a man who would soon be arriving. *See id.* After the robbery took place and the man who took the money left the store, the clerk's sister followed the robber for about twenty-five to thirty feet and saw him go between two buildings. *See id.* at 648. Shortly thereafter, she observed an orange colored Datsun drive away from the parking lot of one of the buildings. *See id.* A description of the robber's race, height, and dress, and the description of an orange Datsun or Volkswagen were contained in a police broadcast; however, "the broadcast may have improperly" reported that there were two males involved since the facts at that time indicated that there was only one robber. *See id.* at 648–50. An officer who was driving toward the robbery spotted an orange Datsun containing two males who fit the broadcast's description. *See id.* at 648. He pulled the car over, and the occupants were identified—one as the robber and the other as a man seen in the store the evening before—and arrested. *See id.* The defendant argued on appeal that the eyewitness did not provide police with sufficient information because she did not see the robber, or anyone, get into the orange Datsun. *See id.* at 649. The Utah Supreme Court disagreed, explaining that the broadcast "was issued by officers possessing 'a reasonable suspicion justifying a stop'" and that the investigating officer conducted the stop "in 'objective reliance' on the broadcast." *Id.* at 650–51 (quoting *United States v. Hensley*, 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

¶ 19 As in *Bruce*, the color and general description of the convenience store robbers' car was a key factor in Deputy Streker's decision to stop the automobile in which Martinez was a passenger. *See id.* at 648. Indeed, in the present case, the cashier actually saw the suspicious individuals get into the same car that Deputy Streker pulled over; in

*Bruce*, there was less certainty about whether the robber was actually in the orange Datsun,[10] *see id.* at 649. Unlike *Bruce*, there had not been a robbery immediately before the stop of Martinez's vehicle. Nevertheless, the eyewitness account here was more reliable because the cashier personally observed the suspicious individuals enter a vehicle and obtained its license number.

¶ 20 Martinez argues that the facts of this case are more similar to decisions in which the appellate courts of this state have concluded that the circumstances did not support a reasonable, articulable suspicion. For example, in *State v. Swanigan*, 699 P.2d 718 (Utah 1985) (per curiam), the Utah Supreme Court reversed the defendant's conviction on Fourth Amendment grounds. *See id.* at 719. In that case, the first officer to respond to the scene of a home burglary spotted two individuals staring at him while walking on a street located about a block from where the burglary occurred. *See id.* at 718–19. He called dispatch to request that another officer investigate. *See id.* at 719. Based on a general description of the two suspects, another officer stopped them "[o]ver two hours later" and about three blocks from the scene of the burglary. *Id.* The officer who received the dispatch call, assisted by the officer who first relayed the information and one backup officer, conducted a warrants check and arrested both individuals after discovering an outstanding traffic warrant on the defendant. *See id.* Searches of the two revealed property from the burglarized home. *See id.* The supreme court held that "the officer who stopped defendant and his companion lacked a reasonable suspicion to believe they had engaged in criminal conduct." *Id.* The court explained that:

> The stop was based solely on a description by a fellow officer who had observed the two walking along the street at a late hour in an area where recent burglaries had been reported. Neither officer had any knowledge that defendant and his companion had been at the scene of the crime.

---

10. In *State v. Bruce*, reasonable, articulable suspicion existed where the police broadcast reported that two men were in the orange Datsun, even though the witnesses only reported seeing one robber and never actually saw him in the orange

car. *See* 779 P.2d 646, 649–50 (Utah 1989). Here the cashier reported three suspicious individuals, while it appears that only two—one of whom was Martinez—were passengers in the vehicle that Deputy Streker stopped.

The officers had not observed the men engaged in any unlawful or suspicious activity. On the facts presented, the stop was based on a mere hunch rather than the constitutionally mandated "reasonable suspicion"; consequently, the confiscated evidence was erroneously admitted at trial. *Id.*

¶ 21 We believe that *Swanigan* is distinguishable from the case before us. In *Swanigan*, the men spotted in the vicinity of the home burglary were stopped over two hours later, and there was never a description of the robbers; the officers' belief that the individuals were involved in the robbery was based merely on the lateness of the hour and the fact of and proximity to the home burglary. *See id.* Here, Deputy Streker stopped the defendant minutes after the reported suspicious conduct. Moreover, Deputy Streker's subjective belief that the individuals outside of the Texaco were planning a robbery was based on more than the fact of and proximity to the recent criminal activity in the area. Deputy Streker's decision was also based on the cashier's description of the suspicious conduct, and the fact that the individuals matched the general descriptions of the recent convenience store robbers and were driving a vehicle of the same size and color as the robbers' getaway car. Thus, Deputy Streker knew more than simply that there had been recent criminal activity in the area.[11] *Cf. id.*

¶ 22 We are also unpersuaded by Martinez's reliance on *State v. Carpena*, 714 P.2d 674 (Utah 1986) (per curiam). In *Carpena*, a patrol officer followed and then stopped "a slowly moving automobile with Arizona plates" at 3:00 a.m. in a neighborhood where there had been a number of recent burglaries. *Id.* at 675. The Utah Supreme Court noted that "[t]he officer did not observe any criminal or traffic offense, and no report of a burglary had been reported to the police that night." *Id.* The court explained: "The stop was based merely on the fact that a car with out-of-state license plates was moving slowly through a neighborhood late at night. The officer had no objective facts on which to base a reasonable suspicion that the men were involved in criminal activity." *Id.; cf. State v. Rodriguez–Lopi*, 954 P.2d 1290, 1292–93 (Utah Ct.App.1998) (holding that reasonable, articulable suspicion existed where the defendant drove near the curb, outside of the traffic lane, and spoke with known prostitutes).

¶ 23 Unlike this case, the officers in *Carpena* had no description of any suspects or vehicles used in any of the recent burglaries. Moreover, the stop in this case was based on the cashier's report of behavior by the individuals that day, which was consistent with the mode of operation of the robbers and could reasonably be interpreted as efforts to plan a future robbery. In light of the similarities between these individuals and the suspects in the prior robberies, combined with the reported observations of the cashier, Deputy Streker had more information to support his reasonable, articulable suspicion than did the officer in *Carpena*. *Cf. Salt Lake City v. Ray*, 2000 UT App 55, ¶¶ 2, 19, 998 P.2d 274 (holding that no reasonable, articulable suspicion existed where a female made a purchase from and then waited outside of a convenience store for two hours, and officers did not believe or have knowledge of any crime she "might have committed or was about to commit").

¶ 24 Martinez also relies on *State v. Trujillo*, 739 P.2d 85 (Utah Ct.App.1987), wherein this court held that the officer did not have reasonable, articulable suspicion to detain the defendant. *See id.* at 89. The officer in *Trujillo* based the detention on the following factors: (1) it was a high-crime area in which several car prowls had been reported in the weeks prior, (2) the lateness of the hour, (3) the nervousness of the detained individuals, and (4) the suspicious bag that the defendant

---

11. For example, where the robberies occurred, what type of stores were being robbed, general descriptions of the suspects and their getaway car, and some details of their "method of operation" are facts that establish more than just a report of recent criminal activity in the area. Although the recent store robberies were committed at night, Deputy Streker could have reasonably believed that the individuals outside the Texaco were "casing the store for a planned robbery," *see Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), "at some point," *see Terry v. Ohio*, 392 U.S. 1, 28, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

attempted to "stash." *See id.* at 86. After applying *Carpena, Swanigan, Terry,* and *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (holding that the defendant's investigatory detention was unconstitutional), the *Trujillo* court concluded that "the totality of the circumstances ... of [the defendant's seizure] do not support a reasonable suspicion that [he] was involved in criminal conduct." *Trujillo,* 739 P.2d at 89. The court reasoned that:

> The initial decision to stop was based merely on the lateness of the hour and the high-crime factor in the area. The subsequent "nervous" conduct on the part of the trio when approached by [the officer] is consistent with innocent as well as with criminal behavior.... [The officer] could not recall receiving reports of any criminal activity in the area that morning. In fact, the only recent criminal activity in the neighborhood had been "car prowls," behavior inconsistent with the trio's peering in store windows. [The officer] did not observe the trio engage in any criminal conduct.

*Id.* (emphasis omitted).

¶ 25 *Trujillo* is distinguishable from this case. The behavior reported by the Texaco cashier—repeatedly moving from the front doors to the side of a building to confer with others when customers enter—is consistent with robbery in general and the recent convenience store robberies in particular. *Cf. id.* ("[T]he only recent criminal activity in the neighborhood had been 'car prowls,' behavior inconsistent with the trio's peering in store windows." (emphasis omitted)); *Ray,* 2000 UT App 55, ¶¶ 2, 19, 998 P.2d 274 (concluding that officer's stop of defendant was not justified where "[the convenience store manager] did not advise [police] of any suspicions he may have had that [defendant] had engaged in any illegal activity" and "[the officers] had no knowledge of any violation of the law that [defendant] might have committed or was about to commit"). In addition, one important fact in *Trujillo* was "the lack of any current reports of criminal activity in

the area." *State v. Baumgaertel,* 762 P.2d 2, 4 (Utah Ct.App.1988) (citing *Trujillo,* 739 P.2d at 89); *accord Trujillo,* 739 P.2d at 89. Here, police had a current suspicious persons report which was consistent with the suspects, automobile, and mode of operation involved in recent robberies in the area.[12]

¶ 26 Indeed, this court distinguished the stop in *State v. Baumgaertel,* 762 P.2d 2 (Utah Ct.App.1988), from those at issue in *Trujillo, Carpena,* and *Swanigan. See Baumgaertel,* 762 P.2d at 4. In *Baumgaertel,* the court explained that the circumstances were not limited to nervous conduct in a high-crime area at a late hour:

> *Carpena, Swanigan,* and *Trujillo* suggest that travelling in a lawful manner at a late hour in a high crime area, and acting in a nervous manner in the presence of police is not sufficient to support a reasonable suspicion that the suspect is involved in criminal conduct. The instant facts, however, are distinguishable from these cases. Here, while the above factors were present, the deputy also based his decision to follow the pickup truck upon his observation that he had not seen this particular truck when he had inspected Ernie's Automotive parking lot fifteen minutes earlier and that there was no legitimate reason for the truck to be there, since Ernie's Automotive had been closed for over eight hours. This observation elevated the deputy's decision to follow the truck from being a mere "hunch," to a fact sufficient for the deputy to conclude that the occupants of the vehicle may have been engaged in criminal activity.

*Id.* The present case is similar to *Baumgaertel* in that it was not just the suspicious conduct of Martinez and his companions that triggered Deputy Streker's stop. Nor was it merely the fact that there had been a rash of recent robberies in the area. It was also the similarity of the cashier's description of the suspicious individuals and their car to the robbery suspects and their getaway car, as well as the matching detail from the recent robberies regarding the behavior of the suspects.

---

**12.** Deputy Streker testified that the "method of operation" used in at least two of the three recent convenience store robberies was that the

robbers would park across the street, watch customers as they came and went, and enter the store once it was clear.

¶ 27 Based on the foregoing authority, we conclude that the present case is more consistent with *Terry, Bruce, Markland,* and *Baumgaertel* than with *Swanigan, Carpena,* and *Trujillo.*[13] Although the question is close, we are persuaded that the supreme court's decision in *Markland,* which is the only Utah case relied upon by the parties that was decided under the currently-applicable standard of review, *see State v. Brake,* 2004 UT 95, ¶ 15, 103 P.3d 699, is instructive. In *Markland,* the officer acted on the basis of screams reported by a witness of unknown reliability—without any evidence that a crime had been committed—because Markland's explanation of where he was headed was not believable. The supreme court reversed this court's conclusion that the stop violated Markland's Fourth Amendment rights. In light of that recent authority and this case's similarity to *Terry,* we hold that the trial court did not err in denying Martinez's motion to suppress.

## CONCLUSION

¶ 28 Deputy Streker had "some minimal level of objective justification for making the stop." *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted). He therefore had reasonable, articulable suspicion that Martinez and his companions had committed a crime, were planning or attempting to commit a crime, or both, and was justified in making an investigatory stop in order to dispel that reasonable suspicion.

¶ 29 Affirmed.

¶ 30 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and WILLIAM A. THORNE JR., Associate Presiding Judge.

---

**13.** Martinez argues that his case is "remarkably similar to" *State v. Valenzuela,* 2001 UT App 332, 37 P.3d 260. However, Martinez's reliance on that case is misplaced. The *Valenzuela* court analyzed an arrest, which qualifies as a level-three encounter and therefore requires probable cause rather than merely reasonable, articulable suspicion. *See id.* ¶¶ 9–10 & n. 2; *see also State v. Markland,* 2005 UT 26, ¶ 10 n. 1, 112 P.3d 507 (describing the three levels of permissible police stops). Not only was the level of stop different, but the facts are distinguishable as well. *See, e.g., Valenzuela,* 2001 UT App 332, ¶¶ 2, 31, 37 P.3d 260 (noting that the tip to police was "from an unidentified informant," and thus "should be viewed on the low end of the reliability scale" (internal quotation marks omitted)).